IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| ANGELA HARRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 05-CV-570-TCK-FHM |
| | ) | |
| LMI FINISHING, INC., an Oklahoma | ) | |
| corporation, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Before the Court is Defendant LMI Finishing, Inc.'s Motion for Summary Judgment
(Docket No. 27). For the reasons set forth below, Defendant is entitled to judgment as a
matter of law on all claims.

## I.      Factual Background

*The Parties*

Plaintiff Angela Harris ("Plaintiff"), an African-American female, began
employment with Defendant LMI Finishing, Inc. ("Defendant") on or around August 14,
2000. Defendant's principal place of business is a manufacturing plant, which is divided
into several departments. From her start date until December 2001, Plaintiff worked in the
"polish department" under the supervision of Jesse Walker ("Walker"). From December
2001 to early 2003, Plaintiff worked in the "shipping department" under the supervision of
Jim Crist ("Crist"). From early 2003 to August 2005, Plaintiff worked in the "milling
department" under the supervision of Brad Johnson ("Johnson"). At the present time,
Plaintiff is still employed by Defendant and works in the shipping department.

1

*The Alleged Harassment*

The crucial events forming the basis of Plaintiff's claims occurred around August 2003 until January 2004, when Plaintiff worked in the milling department under Johnson. At relevant times, Plaintiff worked with two male co-workers, Carlos Arriaga ("Arriaga") and Steve Savage ("Savage"). On or around August 2003, Plaintiff's co-workers discovered she was afraid of mice. (Deposition of Angela Harris ("Harris Dep."), Plf.'s Resp. to Def.'s Mot. for Summ. J., Ex. 5 at 89:25-90:3.) On one occasion, Savage pulled a mouse out of a trash can and dangled the live mouse in front of Plaintiff's face, which made her scream and cry. (*Id.* at 92:7-93:24.) Plaintiff testified that similar incidents involving both live and dead mice occurred a total of three times over approximately a two-month period. (Harris Dep., Def.'s Mot. for Summ. J., Ex. 2 at 104:10-15.)

A few days after the incidents with mice, Savage threw wire parts at Plaintiff, hitting her in the back. (*Id.* at 93:15-16.)[1] Also around this time, Arriaga began calling Plaintiff a "baby monkey" and making "oo, oo, oo" monkey suggestions at Plaintiff. (Harris Dep., Plf.'s Resp. to Def.'s Mot. for Summ. J., Ex. 5 at 93:21-94:18.) Plaintiff alleges Arriaga called her baby monkey two or three times per day for approximately two months. (*Id.* at 97:3-10.) Plaintiff perceived that the name-calling began because "they all got mad at me, saying that I was a tattle tail and I think Brad [Johnson] said something to him [Arriaga] and stuff." (*Id.* at 94:6-8.)

---

[1] According to Janice Loveless ("Loveless"), Defendant's Human Resources Manager who investigated the incident, the wires "are small paper clip type pieces of wire that people clip . . . not any different than a paper wad really." (Deposition of Janice Loveless ("Loveless Dep."), Def.'s Mot. for Summ. J., Ex. 4 at 68:1-6.)

*Verbal Warnings Given to Arriaga and Savage*

Sometime in or before October 2003, Plaintiff complained to Johnson about her co-workers' behavior.  In October 2003,  Johnson verbally reprimanded Arriaga for engaging in "name calling" with Plaintiff.  (*See* Written Warning, Def.'s Mot. for Summ. J., Ex. 11.) In November 2003, Johnson verbally reprimanded Savage for teasing Plaintiff with mice and for engaging in horseplay with the wires.  (*See* Documentation of Coaching, Def.'s Mot. for Summ. J., Ex. 12.)[2]

*Investigation and Written Warnings Given to Arriaga and Savage*

On or around December 18, 2003, Plaintiff was in the bathroom crying about her treatment by her co-workers.  Carmelita Howell ("Howell"), a co-worker, was also in the bathroom.  After hearing Plaintiff's complaints, Howell encouraged Plaintiff to report them to Loveless but Plaintiff refused because she feared being fired.  Howell then reported Plaintiff's complaints to Loveless.  As a result, on December 18, 2003, Loveless called Plaintiff over the intercom and began a formal investigation of Plaintiff's complaints and the entire milling department.  (Harris Dep., Def.'s Mot. for Summ. J., Ex.2 at 94:20-96:2.)

On January 6, 2004, Arriaga received a "Written Warning" for "name calling."[3] According to the memorandum, no additional violations had occurred since Johnson had verbally warned him two to three months prior.  (Written Warning, Def.'s Mot. for Summ. J., Ex. 11.)  On January 6, 2004, Savage received a "Documentation of Coaching" for

---

[2]  Arriaga and Savage later received written warnings for these same incidents, which referenced the prior verbal warnings.  (*Id.*, Exs. 11 and 12.)

[3]  A written warning is the second step in Defendant's progressive discipline policy.  (Loveless Dep., Plf.'s Resp. to Def.'s Mot. for Summ. J., Ex. 10 at 47:21-24.)

"teasing a co-worker with a dead mouse, using inappropriate language, and throwing paper wads and/or wires at co-workers." According to this memorandum, no additional violations had been observed or reported since Johnson had verbally warned him in November 2003. (Documentation of Coaching, Def.'s Mot. for Summ. J., Ex. 12.) Neither Arriaga nor Savage were required to attend mandatory counseling as a condition of continued employment.

*The Alleged Retaliation - Final Warning Given to Plaintiff*

In the course of investigating Plaintiff's complaints, Loveless was told that Plaintiff had herself committed various violations of company policy, including using profane and inappropriate language, placing Arriaga in a headlock, and making threatening statements about co-workers. Back in October of 2001, when Plaintiff worked in the polish department, Plaintiff had received a "Final Warning" for putting a different employee in a headlock. (*See* Disciplinary Action Memo to Angela Harris from Bob Grah, Def.'s Mot. for Summ. J., Ex. 7 (warning Plaintiff for "demonstrat[ing] threatening and abusive language and actions toward a co-worker" and for "'head-lock[ing]' him and wrestl[ing] with him").)[4] Thus, Plaintiff had previously been disciplined for nearly identical conduct to that which was uncovered during the 2004 investigation.

On January 7, 2004, Plaintiff received another "Final Warning" memorandum for using profane language, placing a co-worker (Arriaga) in a headlock, and making threatening

---

[4] Plaintiff disputes that she actually put this employee in a headlock in 2001, but there is no dispute that Plaintiff received a warning for this behavior.

statements about a co-worker (the "2004 Final Warning").[5]   As part of the 2004 Final Warning, Plaintiff was given a supervisory referral to an employee assistance program ("EAP"), which is a free counseling program. Participating in this "treatment plan" was required for Plaintiff's continued employment.  (*See* 2004 Final Warning, Def.'s Mot. for Summ. J., Ex. 9.)  Loveless and Plant Manager Bob Grah ("Grah") made the decision to take disciplinary action against Plaintiff and require her to participate in the EAP.  (Loveless Dep., Def.'s Mot. for Summ. J., Ex. 4 at 101-102.)

A few days after Plaintiff acknowledged receipt of the 2004 Final Warning, she met with Johnson.[6]  Plaintiff told Johnson that her co-workers "got together" and lied to Loveless during the investigation.  (Plf.'s Resp. to Def.'s Mot. for Summ. J., Ex. 16 at 8 ("I am the only woman back there, first of all.  I am the only woman back there.  And then the guys get together and lie on me.  It is their word against my word.  I shouldn't have signed it because I didn't do that and that's where I made my first mistake.").)  Soon thereafter, on January 16, 2004, Plaintiff filed charges against Defendant with the Oklahoma Human Rights Commission.

*Plaintiff's Collapse at Work*

Sometime in January 2004, Plaintiff collapsed at work and was taken to the hospital by an ambulance.[7]  On the day of her collapse, she "couldn't hardly breathe and her head

---

[5]  A final warning is the third step in Defendant's progressive discipline policy. (Loveless Dep., Plf.'s Resp. to Def.'s Mot. for Summ. J., Ex. 10 at 47:21-24.)

[6]  This conversation was tape recorded and is transcribed at Exhibit 16 of Plaintiff's Response to Defendant's Motion for Summary Judgment.

[7]  It is unclear from the record whether the collapse was before or after she filed her complaint with the Oklahoma Human Rights Commission.

was hurting."  When asked to describe what happened at work on the day of her collapse, Plaintiff testified that she had been laughed at by co-workers and told her work was inadequate.  (Harris Dep., Plf.'s Resp. to Def.'s Mot. for Summ. J., Ex. 5 at 125-126.)  She was in the hospital for four days and was off work for approximately eight or nine days. During this time and for approximately eight weeks, she "felt like a cloud was over [her]" and "like [her] life was different" and she "cried and [took] medicine and laid in [her bed]." (*Id.* at 127:11-20.)

*September 2004 Complaint*

Upon her return to work, several months passed without incident.  On September 28, 2004, Plaintiff reported to Johnson that Arriaga was "bumping up against her" and "knocked her in the knuckles with an air blower."  (Email to Loveless from Johnson, *id.*, Ex. 7.)  Johnson investigated the complaint and spoke with Arriaga.  Arriaga denied purposefully running into her, and stated that he tapped her on the hand with an air blower to get her attention.  (*Id.*)  No action was taken against Arriaga.  On December 17, 2004, Loveless conducted a follow-up interview with Plaintiff.  During this interview, Plaintiff reported that no new incidents had occurred, her relations with Arriaga had improved, and that "everything [was] fine."  (*Id.*)

*Present Working Conditions*

At the time of her deposition in May of 2006, Plaintiff testified that she works with a new group of people at the plant and is not having any problems.  (Harris Dep., Def.'s Mot. for Summ. J., Ex. 2 at 167:3-11.)  Plaintiff testified that she likes her job and has no immediate plans to look for other employment. (*Id.* at 118:11-16.)

*Claims for Relief*

6

In her Complaint, Plaintiff explicitly alleges three claims for relief:   (1) discrimination based on race and failure to ensure a non-hostile work environment (Title VII);[8] (2) violation of 42 U.S.C. § 1981 based on subjecting Plaintiff to a hostile work environment and placing unlawful restrictions on her employment;[9] and (3) intentional infliction of emotional distress.  Plaintiff's Complaint also references "retaliation," and both parties have addressed a retaliation claim in their summary judgment briefing.

## II.    Summary Judgment Standard

Summary judgment is proper only if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party bears the burden of showing that no genuine issue of material fact exists. *See Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006) (citation omitted). The Court resolves all factual disputes and draws all reasonable inferences in favor of the non-moving party.  *Id.* (citation omitted).  However, the party seeking to overcome a motion for summary judgment may not "rest on mere allegations" in her complaint but must "set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e).  In

---

[8] Based on the briefing before the Court, it is also clear Plaintiff asserts a gender-based theory of hostile work environment, which the Court has addressed.

[9] The briefing before the Court does not clearly address Plaintiff's claim for "placing unlawful restrictions on her employment." The only possible fact offered in support of this claim is Plaintiff's mandatory participation in the EAP.  The Court concludes that mandatory attendance at the EAP, which is designed to benefit employees, was not an unlawful restriction on Plaintiff's employment and that Plaintiff's participation was not required for any unlawful or discriminatory reason.  (*See* Loveless Dep., Def.'s Mot. for Summ. J., Ex. 4 at 101-102 (explaining reasons for requiring her attendance)); *see also infra* Part III.B (discussing insufficient evidence of pretext).  If and to the extent Plaintiff has not abandoned this claim, Defendant is entitled to summary judgment.

the context of a case brought under federal employment laws, the trial court must "make a judgment as to whether the evidence . . . could persuade a reasonable jury that the employer had discriminated against the plaintiff." *Hooks v. Diamond Crystal Specialty Foods, Inc*., 997 F.2d 793, 798 (10th Cir. 1998).

## III.    Discussion

### A.    Hostile Work Environment Created by Co-workers[10]

#### 1.    Standard

Plaintiff alleges that behavior by co-workers Arriaga and Savage created a racially and sexually hostile work environment.  To successfully establish her hostile work environment claim, Plaintiff must prove the conduct toward her was (1) unwelcome, (2) based upon her sex or her race, and (3) sufficiently severe or pervasive as to alter the conditions of her employment and create an abusive working environment. *See Harrison v. Eddy Potash, Inc.*, 248 F.3d 1014, 1022 (10th Cir. 2001).  With respect to the second element, Plaintiff must show that the harassment was motivated by racial or gender animus and was not merely general harassment. *See Bolden v. PRC, Inc.*, 43 F.3d 545, 551 (10th Cir. 1994) ("General harassment if not racial or sexual is not actionable.").  With respect to the third element, "a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257, 1261

---

[10]  Both Title VII and 42 U.S.C. § 1981 employ the same analysis. *See Keri v. Bd. of Trustees of Purdue Univ.*, 458 F.3d 620, 641 n.5 (7th Cir. 2006).  Therefore, the following discussion applies to both claims for relief.

(10th Cir. 1998).  The conduct in question must be judged by both an objective and a subjective standard, as it must be "severe or pervasive enough to create . . . an environment that a *reasonable person* would find hostile or abusive," and the victim must "*subjectively perceive* th[at] environment to be abusive."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (emphasis added).  The Court must consider "the totality of the circumstances, considering such factors as 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  *Chavez v. New Mexico,* 397 F.3d 826, 832 (10th Cir. 2006).

Relevant to this case, the Tenth Circuit has further instructed that "facially neutral abusive conduct can support a finding of gender animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, overtly gender-discriminatory conduct."  *Id.*  This is because "[c]onduct that appears gender-neutral in isolation may in fact be gender-based, but may appear so only when viewed in the context of other gender-based behavior."  *Id.*  This same principle applies to consideration of a race-based claim.  *See Bolden*, 43 F.3d at 551 (considering racial comments along with general ridicule in analyzing hostile work environment claim).  Accordingly, in evaluating the summary judgment evidence, the Court has considered all incidents, even if facially neutral, and the work environment as a whole.

2.      Gender-Based Harassment

Plaintiff's claim of gender-based harassment fails because she cannot meet the second element requiring her to establish the alleged harassment was based on her gender.

9

Plaintiff's theory of gender-based harassment centers on the mouse dangling incidents and the wire throwing.  Plaintiff's Complaint alleges that the mouse dangling was accompanied by "inappropriate comments regarding her gender."  (Compl. § 14.)  This allegation, however, was not borne out by any record evidence.  The Court has carefully reviewed Plaintiff's statement of disputed facts and Plaintiff's deposition testimony describing the incidents with the mice and wire throwing and has found no evidence of any comments or behavior by her co-workers that indicated they engaged in the harassment because she was a woman.  Instead, Plaintiff's belief that these incidents were motivated by gender animus is based on the fact that she was the only female in the department:

> Q:  What did they do to discriminate against you because of you being a woman?
>
> A:  I felt it was other guys back there, why didn't you put mice on them?  Why didn't you dingle rats in their face?  Why was Carlos calling them names and only calling me names?  You know, why was Steve doing stuff to me that he wouldn't do to Taylor or Carlos?  They always done it to me, you know.

(Harris Dep., Plf.'s Resp. to Def.'s Mot. for Summ. J., Ex. 5 at 91:13-21.)  Plaintiff's mere belief, combined with her being the only female in the department, is insufficient to raise an inference that the alleged harassment was gender based.  *Cf. McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129-30 (10th Cir. 1998) (plaintiff's "mere belief" that he was treated unfairly is insufficient to support a finding of gender discrimination).  There is no evidence, such as derogatory comments about women or about Plaintiff's status as a woman, accompanying the mouse dangling and wire throwing, nor is there any other evidence that the behavior was motivated by gender animus.  Therefore, there is no evidence to accompany the facially neutral actions involving the mice and wires, such that an inference

could be drawn that the alleged harassment was gender-based.  *See, e.g., Chavez*, 397 F.3d

at 836 (finding that specific gender-based incidents such as seductive speaking and physical

rubbing, combined with gender-neutral incidents, were sufficient to survive summary

judgment); *O'Shea v. Yellow Tech. Svcs.*, 185 F.3d 1093, 1098 (10th Cir. 1999) (finding that

derogatory comments about women poisoned an entire body of conduct toward the plaintiff

such that a jury could view all of the allegedly harassing conduct as the product of sex and

gender hostility).

3.      Race-Based Harassment

Plaintiff's race-based allegations revolve around Arriaga's use of the term "baby

monkey" over a two-month period, which occurred around the same time as the mouse

incidents.[11]  Arriaga's use of this term was accompanied by monkeying gestures and "oo, oo,

oo" sounds.  Plaintiff alleges, and the Court agrees, that the term "monkey" can be racially

derogatory.  *See Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001) (finding

use of word "monkey" to describe African-Americans is, on its face,  racially derogatory).

Thus, unlike Plaintiff's gender theory, Plaintiff's theory of race-based animus has at least

some support in the record, and it is a question of fact as to whether Arriaga's use of the

---

[11]  Plaintiff's only other allegation involving race is that Crist made a statement
that he "would get his slaves to do it" when Plaintiff worked for him in the shipping
department.   (Harris Dep., Plf.'s Resp. to Def.'s Mot. for Summ. J., Ex. 5 at 83:14-23.)
The Court has considered this stray comment as part of Plaintiff's evidence but finds that
it has little persuasive value.  It is clear from the record and the Complaint that the work
environment about which Plaintiff complains is the work environment created by her co-
workers in the milling department in late 2003 and early 2004.  In any event, this stray
comment by Crist was an isolated incident and is insufficient to create a hostile work
environment.

phrase "baby monkey" under the circumstances presented was in fact motivated by racial animus.[12]

Because the Court finds that Plaintiff has alleged sufficient evidence to meet the first element of her race-based hostile work environment claim, the Court must also analyze whether the alleged harassment was sufficiently pervasive or severe to alter the conditions of her employment.  With respect to frequency of the name calling, Plaintiff alleges as follows:

> Q - Do you - is there any other name that you were called other than the time that Carlos [Arriaga] called you baby monkey when you were working in the milling department?
>
> A - No -  just baby monkey all the time for about two months, two or three times a day he's saying it and everything else and they over there laughing like it's . . . I said I appreciate if you don't call me baby monkey no more because I feel like that's discrimination.

(Harris Dep., Def.'s Mot. for Summ. J, Ex. 2 at 96:25-97:10.)  Thus, the race-based evidence includes two months of being called baby monkey on a daily basis by co-worker Arriaga in late 2003, and the facially neutral evidence includes three incidents of mouse dangling and one incident of wire throwing by co-worker Savage in late 2003.

As to the subjective component, there is sufficient evidence that Plaintiff subjectively viewed her working environment in the milling department to be hostile or abusive; this evidence includes her frequent crying, screaming in terror, and eventual collapse at work.

---

[12]  Although Defendant cites testimony of Arriaga and Loveless stating that the "baby monkey" name-calling was playful banter and was not racially charged, the Court must resolve genuine factual disputes in favor of Plaintiff.  Plaintiff denies that she frequently called Arriaga a "baby gorilla," as Arriaga suggests, and contends the name-calling was unwelcome race-based harassment.

Plaintiff must also show that a reasonable person would find the environment hostile or abusive. The Court concludes that a rational factfinder could find that the daily name calling of baby monkey - a name with an arguably racial connotation - occurring over a two month period in a close work environment, could be considered a "steady barrage of opprobrious racial comments," sufficient to create a hostile work environment. *Cf. Witt v. Roadway Exp.*, 136 F.3d 1424, 1432 (10th Cir. 1998) (finding that a plaintiff must show more than a few isolated incidents of racial remarks). In addition, the evidence regarding the mice and wires, if it could be tied to any racial animus, could also contribute to a hostile work environment. Accordingly, Plaintiff has created a question of fact sufficient to survive summary judgment as to the pervasiveness/severity element of her race-based hostile work environment claim.

4. <u>Employer Liability for Co-Worker Harassment</u>

An employer is not strictly liable for all harassment of which it actually or constructively knew; it may discharge its obligation by taking appropriate remedial or preventative action. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 675 (10th Cir. 1998). An employer cannot be found liable for co-worker harassment if the actions taken by the employer were "reasonably calculated to end the harassment." *Id.* Responses that have been deemed reasonable "have often included prompt investigation of the allegations, proactive solicitation of complaints, scheduling changes or transfers, oral or written warnings . . ., reprimands, and warnings that future misconduct could result in progressive discipline." *Id.*

At least as of October or November 2003, Plaintiff had complained about Arriaga's and Savage's behavior to Johnson. After these complaints, Arriaga and Savage both received verbal warnings from Johnson. Thus, Johnson took reasonable steps to end the

behavior.  Management next discovered that Plaintiff continued to have problems with Arriaga and Savage on or around December 18, 2003, when Howell reported Plaintiff's problems to Loveless.  Loveless promptly took appropriate steps to end the behavior.  She conducted an investigation, interviewed all three employees, and disciplined all employees in the milling department for various violations of company policy.  Specifically, Savage and Arriaga received written warnings for their allegedly harassing conduct.  Loveless and Johnson met with Arriaga and made sure he understood the potential "racial connotation" of the name-calling.  (Loveless Dep., Def.'s Mot. for Summ. J., Ex. 4 at 75-77:1.)  Loveless also offered Plaintiff the opportunity to move back to the polish department, which she declined.  (*Id*.)  After these disciplinary actions resulting from the investigation, the "baby monkey" name calling and mouse incidents ceased, evidencing the effectiveness of Defendant's response.  Although Plaintiff did collapse at work after the disciplinary action was taken, there is no evidence that the collapse was caused by any racially hostile behavior or that Defendant knew about but failed to prevent any continuing hostile behavior.

Finally, Plaintiff's complaint in September 2004 about Arriaga bumping into her was not accompanied by any racial remarks and is too distant in time to connect back to reports regarding the "baby monkey" comments.  (*See* Plf.'s Resp. to Def.'s Mot. for Summ. J., Ex. 7.) Therefore, this September 2004 complaint relates only to general harassment and is not actionable.  *See Bolden v. PRC, Inc.*, 43 F.3d 545, 551 (10th Cir. 1994) ("General harassment if not racial or sexual is not actionable.").  In any event, Loveless conducted a follow-up interview in December 2004, and Plaintiff told her everything with Arriaga was fine.

The Court finds no evidence whatsoever of negligence by Defendant in handling Plaintiff's complaints regarding the allegedly hostile work environment in the milling department. Instead, every time management became aware of problems, management took remedial and preventative action that was reasonably calculated to end the alleged harassment. The disciplinary action progressed logically from verbal warnings to written warnings, and then, to the best of Defendant's knowledge, the alleged harassment ceased. The Court finds the employers' actions were prompt, effective, and "reasonably calculated to end the harassment." *See Turnbull v. Topeka State Hosp.*, 255 F.3d 1238, 145 (10th Cir. 2001) (explaining that promptness and effectiveness are key factors in determining whether an employer response was reasonably calculated to end the harassment). Although Plaintiff believes that the ultimate punishments given after the 2004 investigation were unfair and that she received greater punishment than her coworkers for less culpable behavior, this goes to her "retaliation" claim and does not evidence any negligence by Defendant in failing to prevent a hostile work environment. Because the Court finds no basis for employer liability, the Court grants summary judgment to Defendant on Plaintiff's hostile work environment claim.

B.   <u>Retaliation</u>

To establish a prima facie case of retaliation, Plaintiff must show: (1) that she engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action. *Haynes v. Level 3 Communications, LLC*, 456 F.3d 1215, 1228 (10th Cir. 2006). To meet her prima facie case,

15

Plaintiff alleges that (1) she engaged in protected opposition to discrimination by reporting the conduct of her co-workers to Walker, Johnson, and Loveless at various times; (2) receipt of the 2004 Final Warning was a materially adverse action; and (3) closeness in time between her complaints and the adverse action evidences causation.  The Court assumes, without deciding, that Plaintiff can meet her prima facie case.

If Plaintiff can make a prima facie case, the burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for the 2004 Final Warning.  Defendant has done so. The primary reason given is that Plaintiff placed Arriaga in a headlock, in violation of LMI-HR Manual for Hourly Employees, Page 4.2 C. Safety Rules and Safe Work Practices, which provides that employees must "[a]void any behavior which might cause physical violence, such as . . . profane language, . . . aggressive gestures . . . (including grabbing . . .)"  (*See* Def.'s Mot. for Summ. J., Ex. 9.)  Plaintiff had already received a Final Warning for placing a different employee in a headlock in 2001.  (*See id.*, Ex. 7.)  The 2004 Final Warning expressly references the prior violation as a reason for the disciplinary action, substantiating Defendant's proferred reason for the disciplinary action.  The Court finds this repeated violation of company policy, as set forth in the 2004 Final Warning, is a legitimate, non-discriminatory reason for the 2004 Final Warning.  With respect to the EAP, Loveless and Grah made the decision that participation in the EAP would be beneficial because of Plaintiff's "history of conflict with co-workers," because she "seemed to be emotional at work," and because they wanted to provide her some counseling rather than terminate her. (*Id.* at 102:1-7.)  The Court finds Defendant's stated reason of Plaintiff's history of conflict

with co-workers is a legitimate, non-discriminatory reason for mandatory participation in the EAP.

Once an employer has offered a legitimate, non-discriminatory reason, the burden shifts back to the plaintiff to demonstrate that the proferred explanation is a pretext for retaliation. *Argo v. Blue Cross and Blue Shield of Okla.*, 452 F.3d 1193, 1203 (10th Cir. 2006). To show pretext, Plaintiff must produce evidence of "such weaknesses, implausibilities, incoherencies, or contradictions in the employer's proferred legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reason." *Id.*

Plaintiff's argument and evidence regarding pretext is that (1) Defendant's explanation for the warning is somehow inconsistent with the warning's contents, and (2) there is an unfair disparity between Plaintiff's punishment and Savage and Arriaga's punishment. (*See* Plf.'s Resp. to Def.'s Mot. for Summ. J. at 17-18.) Because the 2004 Final Warning states that the headlock was merely an "act of horseplay," Plaintiff argues that a Final Warning is an "inconsistent" and overly severe punishment. However, there is nothing inconsistent about Loveless' testimony, the contents of the 2004 Final Warning, and the disciplinary action taken. All three pieces of evidence reference the 2001 violation for similar behavior and the need to prevent disruptive behavior in the workplace. Despite the fact that the headlock was horseplay, rather than a violent or aggressive headlock, Defendant determined that a Final Warning was an appropriate punishment due to Plaintiff's prior violation for the same type of behavior. (Loveless Dep., Def.'s Mot. for Summ. J., Ex. 4 at

49:4-19.)   Further, although Plaintiff told Johnson her co-workers lied during the investigation (*see* Plf.'s Resp. to Def.'s Mot. for Summ. J., Ex. 16), Plaintiff cannot establish that Loveless should have known they were lying or that Loveless was somehow complicit in a scheme to retaliate against Plaintiff for making her complaints.  Instead, the evidence shows that Loveless conducted a fair investigation and made a business decision based on the evidence in front of her.  This Court will not second guess Loveless' business decision. *See Argo*, 452 F.3d at 1203 ("Yet Title VII charges neither this Court nor the jury to act as a 'super personnel department' that second guesses employers' business judgments.").[13]

Plaintiff also argues that Savage and Arriaga's punishments, which were mere "Written Warnings" and which did not require attendance at the EAP, evidence retaliatory motive against Plaintiff.  However, this argument rests on Plaintiff's subjective perception that Savage and Arriaga committed "more serious" violations by name-calling, mouse dangling, and wire throwing.  Defendant did not believe that Arriaga and Savage's violations were more serious.  When asked about the disparity between Plaintiff and Savage's punishments, Loveless testified that "Savage did not put his hands on [Plaintiff] and [Plaintiff] did, and Steve . . had not been warned about that type of horseplay before and [Plaintiff] had."  (Loveless Dep., Def.'s Mot. for Summ. J., Ex. 4 at 67:13-20.)  It is clear that the physical touching and the repeat offense made Plaintiff's violation more serious in the mind of the employer, and the Court finds no evidence that could lead a reasonable

---

[13]   Although there is evidence in the record that Plaintiff received generally positive evaluations (*see* Plf.'s Resp. to Def.'s Mot. for Summ. J. Exs. 1-4), the Court finds these do not provide sufficient evidence of pretext to create a factual question, in light of the specific prior violation for similar conduct that is also in Plaintiff's personnel file.

factfinder to find this explanation implausible, weak, or in any way inconsistent.  The different punishments were warranted because the employees were not similarly situated. *Cf. Antonio*, 458 F.3d at 1182 (explaining that retaliatory motive could be inferred from disparate application of handbook policies only where a plaintiff can show she was treated differently than similarly situated employees).

The Court finds insufficient evidence of pretext and concludes that no reasonable jury could conclude that the 2004 Final Warning was retaliatory in nature. *See Argo*, 452 F.2d. at 1204 (where there was violation of company policy immediately preceding adverse employment action and the violation was described in internal documents describing the decision, no reasonable jury could conclude the adverse action was retaliatory). Accordingly, Defendant is entitled to judgment as a matter of law on Plaintiff's claim for retaliation.

C.      Intentional Infliction of Emotional Distress

Oklahoma recognizes intentional infliction of emotional distress as an independent tort. *Eddy v. Brown*, 715 P.2d 74, 76 (Okla. 1986).  In Oklahoma, to prove intentional infliction of emotional distress, a plaintiff must meet the narrow standards of RESTATEMENT (SECOND) OF TORTS § 46, which provides in pertinent part:  "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."  RESTATEMENT (SECOND) OF TORTS § 46. "[L]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly

19

intolerable in a civilized community.  Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'"  *See Breeden v. League Servs. Corp.*, 575 P.2d 1374, 1376 (Okla. 1978) (citing RESTATEMENT (SECOND) OF TORTS § 46).  It is the trial court's responsibility initially to act as gatekeeper -- to determine first whether the defendant's conduct may reasonably be regarded as sufficiently extreme and outrageous to sustain a claim.  *See id.* at 1377.   Likewise, it is for the court to determine whether, based upon the evidence presented, severe emotional distress can be found.  *See id.*

Plaintiff alleges that Arriaga's calling Plaintiff "baby monkey" on a daily basis is sufficient to satisfy this standard.  (*See* Plf.'s Resp. to Def.'s Mot. for Summ. J. at 22-23.) However, even if true, Plaintiff has shown no reason that Defendant should be held liable for the actions of Arriaga.  As explained above, the Court finds no negligence on the part of Defendant in handling the employment situation at issue.  Instead, Defendant disciplined Arriaga, both verbally and in writing, upon receipt of complaints.  Further, it is doubtful that Arriaga's actions, even if imputed to Defendant, can meet the high standard for this tort in the employment law context.  Indeed, employers' conduct has been deemed insufficient to give rise to a claim for intentional infliction of emotional distress in cases with similar or more compelling facts than those presented here.  *See, e.g.*, *Merrick v. N. Nat. Gas Co.*, 911 F.2d 426, 433 (10th Cir. 1990) (plaintiff alleged employer harshly criticized him, yelled at him, and cursed at him prior to his termination); *Eddy*, 715 P.2d at 76 (plaintiff alleged multiple instances of ridicule and harassment).   Accordingly, Defendant is entitled to judgment on this claim as a matter of law.

20

**IV.**     **Conclusion**

Defendant LMI Finishing, Inc.'s Motion for Summary Judgment (Docket No. 27) is

GRANTED.

**ORDERED this 12th day of January 2007.**

**TERENCE KERN**
**UNITED STATES DISTRICT JUDGE**

21